### In the Matter of Thomas H. BAREFOOT.

### No. 82S00–8603–DI–271.

Supreme Court of Indiana.

Jan. 24, 1989.

Laurie Baiden Bumb, John D. Clouse and Michael C. Keating, Evansville, for respondent.

David B. Hughes, Staff Atty., Indianapolis, for the Indiana Supreme Court Disciplinary Com'n.

## DISCIPLINARY ACTION

### PER CURIAM.

This matter is before the Court on a Second Amended Verified Complaint for Disciplinary Action charging the Respondent with three counts of professional misconduct. The Hearing Officer appointed by this Court has conducted a hearing on the complaint and on an accompanying Verified Motion For Suspension Pending Prosecution and tendered his report and recommendation. Upon review of the Hearing Officer's report, this Court, on June 30, 1987, entered an order suspending the Respondent pending final determination of this cause.

The Respondent has petitioned for review of the Hearing Officer's report contending that the findings and conclusions are not supported by sufficient evidence. Subsequently to the filing of the findings of fact and the petition for review, the Respondent also tendered a petition for leave to resign from the bar. On October 31, 1988, the Respondent's Petition to Resign was denied as untimely and inadequate.

Accordingly, we will proceed with the review process, whereby we examine all matters presented, including the Hearing Officer's findings and conclusions. Although such findings are not binding on this Court, they do receive emphasis due to the Hearing Officer's unique opportunity for direct observation of the witnesses. *In re Stanton*, (1986), Ind., 492 N.E.2d 1056; *In re McDaniel* (1984), Ind., 470 N.E.2d 1327; *In re Welke* (1984), Ind., 459 N.E.2d 725.

Having so reviewed all matters, we find, under Count I of the Complaint, that in May of 1982, the Respondent began representing U.S. Life Credit Corp. in collection matters. Respondent's dealings with U.S. Life were done exclusively through their office in Henderson, Kentucky, although U.S. Life had numerous other offices and was headquartered in Schaumburg, Illinois.

The Respondent and U.S. Life had agreed orally that Respondent's attorney fee for such representation would be one-third (⅓) of all sums collected from accounts assigned to him, whether the collections were actually received by the Respondent or by U.S. Life. In October, 1982, U.S. Life employed Respondent to pursue two additional collection matters, one against Edward and Joann Terrell, and one against Natasha Gulley.

On April 5, 1983, the Respondent obtained default judgments in both matters, in the Gulley suit for the principal sum of $884.22 plus attorney fees of $200 and court costs and, in the Terrell suit, for the principal sum of $1,274.00 plus attorney fees of $300.00 and court costs. The Respondent had been advised by the Henderson Branch Office that the Terrell judgment appeared uncollectible and likely would be "written off" at the Home Office, but there is no evidence that he was ever advised to cease efforts to collect the judgment. In September of 1983, the Henderson Branch Office of U.S. Life advised the Respondent that said branch would be closed on September 30, 1983, and that all current U.S. Life accounts had been purchased by another company. The Respondent was advised that his future dealings with U.S. Life would be handled by the home office.

The Respondent had previously obtained a garnishment order in the Gulley matter,

and, eventually, Gulley's wages were garnished and payments to the Respondent were made through the office of the clerk of the court.

By August 11, 1984, the Respondent had received checks amounting to $811.29. Of that sum, $526.29 was not deposited in a segregated account and $285 was deposited into an escrow account on August 21, 1984. Between September, 1984, and June, 1985, the Respondent received four additional checks, totaling $343.88, which he also deposited in the escrow account. The Respondent received a total of $1,155.17 from the Gulley garnishment. Respondent's escrow account was overdrawn on more than thirty occasions between September 18, 1984, and June 14, 1985.

Commencing September 10, 1984, the home office of U.S. Life began what became a series of failed attempts to contact the Respondent about the status of the Gulley suit. Between October 3, 1984, and May 8, 1985, U.S. Life made approximately 24 telephone calls to Respondent's office and wrote two letters to the Respondent requesting a written status report. In December, 1984, and again in February, 1985, U.S. Life was informed that it would be paid its due from the Gulley judgment, but no payment was made. On June 20, 1985, U.S. Life wrote the Respondent and informed him that the matter would be referred to the Disciplinary Commission if they did not receive what was owed. By July, 1985, a grievance filed with the Disciplinary Commission was referred to the Evansville Bar Association for investigation. The Respondent produced for the Evansville Bar Association a copy of a cashier's check in the amount of $632.48, showing the Respondent as remitter and U.S. Life as the payee. In fact, the Respondent never sent the aforesaid check to U.S. Life.

On July 21, 1986, the Respondent wrote a letter to the General Counsel for U.S. Life attempting to explain his dealings with the company and giving a purported accounting which showed a net of $298.78 due U.S. Life from the Gulley garnishment. The Respondent remitted the latter amount to U.S. Life but the amount was disputed.

In his petition for review, the Respondent makes several assertions, without reference to the record, wherein he attempts to explain and justify his conduct as set out above. He claims that U.S. Life had agreed that his fee would be one-third of all sums collected in addition to any attorney fees which might be awarded by the court. As to the Terrell judgment, the Respondent claims that he abandoned his collection efforts and closed out his file, subject only to later payment of his $300 attorney fee out of the Gulley judgment, because he was advised by U.S. Life that the Terrell judgment would be written off.

The Respondent applied the first three checks collected from the Gulley action, which totaled $811.29, toward his attorney fees and expenses. He further contends that he first received an inquiry from U.S. Life as to the Gulley judgment on September 12, 1984. Without any supporting documentation, the Respondent claims that he set aside $300 cash, which he had determined to be the most owed to U.S. Life, and he kept the same in a locked metal box in his office for eventual distribution to U.S. Life. The remaining four checks, which totaled $343.88, the Respondent deposited in his business account, also as payment and reimbursement of the balance of his attorney fees. The Respondent makes a further unsubstantiated assertion that, during the time he was collecting these payments, he or his secretary advised U.S. Life of the status of the garnishment collections. The Respondent attributes any additional delay in submitting the promised final accounting and refunding the requested payment to the relocation of his law office.

After an opportunity to hear the testimony and review the evidence, the Hearing Officer concluded that Respondent's assertions were simply incredulous. Neither the record nor Respondent's self-serving statements present any credible evidence which would lead us to a contrary conclusion.

We conclude, as did the Hearing Officer, that there is no documentary evidence to

support any of Respondent's foregoing contentions. Accordingly, we conclude from the foregoing findings that the Respondent neglected a legal matter entrusted to him, in violation of Disciplinary Rule 6–101(A)(3); by failing to remit to U.S. Life its share of garnishment collections, he violated Disciplinary Rule 7–101(A)(3); by failing to render a timely or proper accounting, he further violated Disciplinary Rules 9–102(B)(3) and (4); by using his client's funds as his own without his client's consent, he converted said funds in violation of I.C. 35–43–4–3 and thus engaged in illegal conduct, conduct involving moral turpitude and dishonesty, and conduct which adversely reflects on his fitness to practice law, all in violation of Disciplinary Rules 1–102(A)(3), (4) and (6) of the *Code of Professional Responsibility for Attorneys at Law.*

Under Count II, we find that Cathey and Dan Green retained the Respondent to represent them in adopting an infant child. In June of 1984, based upon information given to him by the Greens, the Respondent located a willing prospective mother. The infant was born on July 5, 1984. The Respondent performed substantial services in connection with the adoption, both prior to and shortly after the child's birth, including appearing in Court on July 6, 1984, in a proceeding to obtain custody pending adoption.

On July 9, 1984, the Respondent asked the Greens for a preliminary fee of $1,000 which the Greens paid by check. Prior to this, the Greens had agreed to pay all of the hospital expenses of the mother and child as well as the mother's attorney fees. It was agreed that the Respondent was to pay the various expenses from funds provided to him by the Greens, so that the medical care providers would not be aware of the Greens' identity. The Respondent wrote to at least two of the health care providers and specifically stated that his clients, the adoptive parents, would be paying the medical expenses and that bills for the same should be sent to the Respondent.

In late August, 1984, the Respondent had assembled virtually all of the bills and invoices and sent the Greens a final invoice showing $3,989.19 for all birth related expenses and attorney's fees. The health care expenses amounted to $3,009.19, court costs were $30, the Mother's attorney's fee was $450 and the balance of Respondent's fee was $500. On September 17, 1984, the Greens paid the Respondent $3,989.19 by a check which, as requested by the Respondent, was made payable to "Thomas H. Barefoot, attorney Escrow Account".

The Respondent deposited the check in his escrow account and promptly paid certain of the invoices for which he had billed the Greens, but he made only a partial payment of $96 to the hospital whose total bill was $2,087.69. The balance of the proceeds from the Greens' check, approximately $3,000, the Respondent used for personal needs.

The hospital referred the matter to their attorney, and he and the Respondent reached an agreement whereby the Respondent was to pay off the balance in three equal installments of $435.64. The Respondent paid the first installment in a timely fashion, but his check for the second installment was returned for "non-sufficient funds". Thereafter, the hospital filed suit against the Respondent. In the process, however, the hospital had to pursue collection efforts against the mother, its actual account debtor. The mother was upset by these collection efforts and was required to consult counsel. Upon learning that the Respondent had not paid the hospital, the Greens voluntarily paid the bill which amounted to $951.28.

The Respondent was unable to attend the final adoption hearing because of car trouble. The hearing proceeded and was concluded in his absence, but no entry was made by the Court on that date. Although the Respondent advised the Greens that he had sent the adoption decree to the Court, a decree had not been received. The Greens became frustrated with Respondent's lack of performance and retained another attorney to finalize the adoption. As matters turned out, the Respondent eventually sent an adoption decree to the court on March 25, 1985, and both, Respon-

dent's draft and the draft from the Greens' new attorney were approved by the court.

In his petition for review, the Respondent again challenges the findings as being contrary to his version of the events. He contends that he had an agreement with the mother and the health care providers that he would be personally liable for all of the medical expenses incurred by the mother and infant. He further contends that he had made a verbal agreement with Mr. Green that the Respondent would reduce his attorney's fee to $1,500, provided the Greens would give all of the money owed to the health care providers to him and permit him to pay off all expenses on an installment basis. Testimony and documentary evidence, including correspondence by the Respondent himself, are in direct contradiction to Respondent's contention.

In light of the foregoing findings, we conclude that the Respondent engaged in the charged misconduct. He violated Disciplinary Rules 7–101(A)(1), (2) and (3) by failing to pay the amount collected from the Greens to the appropriate creditors. By using clients' funds for personal purposes he committed a crime under Indiana Code 35–43–4–3 and violated Disciplinary Rules 1–102(A)(3), (4), (5) and (6) of the *Code of Professional Responsibility for Attorneys at Law*. By the foregoing conduct the Respondent further violated Disciplinary Rule 6–101(A)(3) in that he neglected a legal matter entrusted to him.

As to Count III, we find that Dorthea Schell and her husband first visited the Respondent in March, 1983, to inquire as to possible representation in administering the estate of Dorthea Schell's Mother, Margie Dearing, who had died intestate on August 15, 1982. The Respondent informed them that his fee would be between $800 and $900. The Schells were agreeable and indicated to the Respondent that he should proceed.

Schell was unable to appear with the Respondent to open the estate but the Respondent advised Schell that the Respondent would be willing to open the estate alone and serve as personal representative without charging a personal representative's fee. On May 17, 1983, the Respondent opened the estate and qualified as personal representative.

At Respondent's request, Schell and her husband met with the Respondent at his office on December 16, 1983. The Respondent provided them with a copy of proposed Indiana Inheritance Tax Schedule which showed that the Respondent was receiving attorney's fee of $800 and a personal representative's fee of $150. He also presented a document entitled "Waiver of Notice and Concurrence In Closing Statement Filed By Personal Representative" which Schell executed under oath. Said document stated that she (Schell) has been forwarded a written statement of the Personal Representative's activities with regard to the estate, waived further notice with regard to said matter, and concurred in the Closing Statement filed by the Personal Representative. The written statement to which the Respondent had referred to in Schell's waiver was Respondent's "Administrator's Verified Closing Statement to Close Estate Upon Completion of Administration", wherein he stated, under oath, that he had fully administered the estate. The Respondent also gave Schell a hand-written order in which he had calculated the inheritance tax for the estate to be $784.24.

The Respondent asked and received from Schell two checks, payable to him, one for $950 as attorney and personal representative fee and one for $817.24 representing the projected tax plus court costs of $33.

Within one week following their meeting, the Respondent had expended Schell's check for $817.24 for his personal uses. He did not pay any inheritance taxes or court costs.

On January 4, 1984, the Respondent filed the inheritance tax schedule which he had signed under oath on December 16, 1983. He took no other action in the estate until August 16, 1985, when he signed and filed an amended Indiana Inheritance Tax Schedule which was identical to the first except that it showed Respondent's attorney fees a $2,650, his personal representative fees as $1,325, and additional attorneys fees for

preparation of a Survivorship Affidavit and Personal Representative's Deed as $70.

In December of 1985 Schell's son attempted to refinance the decedent's home which had been transferred to him. It was at this time that Schell first learned that there was a lien on the property because inheritance tax had never been paid. After Schell contacted the Respondent to inquire about the matter, the Respondent promised to look into it but never again contacted Schell. At the time of the findings of fact, the Respondent and Schell disputed the question of Respondent's fees for which Schell was required to retain another counsel.

On January 7, 1986, the Respondent filed the two documents which he had prepared and which Schell had executed on December 16, 1983. The Respondent, however, changed the date of the year in which they purportedly were executed so that it appeared that each had been executed in 1985 rather than 1983. Schell had to pay the outstanding inheritance tax and penalty owed by the Estate.

The Respondent challenges the foregoing findings. He does not deny using as his own all funds provided to him by Schell or that Schell intended the $817.24 check to be used to pay inheritance tax and court costs. Rather, he contends that he informed the Schells that both checks would be used for administrative expenses of the estate, namely that he would apply them toward his attorney and personal representative fees. He claims further that he advised Schell that her tax liability would become due and payable upon her receipt of the court's order determining said liability. When she later inquired about the lien, he advised her that it was due to her own failure to pay the inheritance tax.

We are not persuaded by Respondent's unsubstantiated, self-serving contentions. We conclude, as did the Hearing Officer, that the Respondent, by using as his own client's funds entrusted to him for payment of inheritance taxes, engaged in criminal conversion in violation of Indiana Code 35–43–4–3. He, thus, engaged in illegal conduct involving moral turpitude and dishonesty, and conduct which adversely reflects on his fitness to practice law, in violation of Disciplinary Rules 1–102(A)(3), (4) and (6). He violated Disciplinary Rule 6–101(A)(3) in that he neglected a legal matter entrusted to him; he failed to carry out a contract of employment and prejudiced and damaged his client, in violation of Disciplinary Rule 7–101(A); and he failed to render a proper accounting to his client in violation of Disciplinary Rule 9–102(B)(3) of the *Code of Professional Responsibility for Attorneys at Law.*

Having concluded that the Respondent has engaged in professional misconduct, we must now assess an appropriate sanction. In making such a determination in this particular case we need only look to the very nature of Respondent's acts. His repeated misuse of entrusted funds depicts a dishonesty which cannot be tolerated in a professional relationship that necessarily involves fiduciary responsibilities. We would be remiss in our duty to the public and the legal profession were we to allow the Respondent to continue in the practice of law.

In light of the foregoing considerations and by virtue of the misconduct set out above, we find that the strongest sanction available should be imposed. It is, therefore, ordered that the Respondent, Thomas H. Barefoot, is disbarred from the practice of law.

Costs of this proceeding are assessed against the Respondent.

SHEPARD, C.J., not participating.